IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| BRENT A. BRADLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 15-4292-CV-C-REL-SSA |
| NANCY A. BERRYHILL, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Brent Bradley seeks review of the final decision of the Commissioner of

Social Security denying plaintiff's application for disability benefits under Title II of the

Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) failing to give

controlling weight to plaintiff's treating physician Blake Corcoran, M.D., that plaintiff can

walk no more than 3 hours per day with a cane or 1 hour without, needs to elevate his

legs, and will have decreased ability to concentrate due to pain; and (2) the hypothetical

in the hearing decision is not the same as the hypothetical to which the vocational

expert testified during the hearing. I find that the substantial evidence in the record as a

whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's

motion for summary judgment will be denied and the decision of the Commissioner will

be affirmed.

## I.    BACKGROUND

On July 10, 2012, plaintiff applied for disability benefits alleging that he had been

disabled since August 3, 2010. Plaintiff's disability stems from an ankle/foot injury and

injury to his tail bone. Plaintiff's application was denied on September 6, 2012. On

January 28, 2014, a hearing was held before an Administrative Law Judge.  On April 18, 2014, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On October 21, 2015, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5

2

(8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

      Yes = not disabled.
      No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

      No = not disabled.
      Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

      Yes = disabled.
      No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

      No = not disabled.
      Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

      Yes = disabled.
      No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff and vocational expert Denise Weaver, in addition to documentary evidence admitted at the hearing.

### A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record shows that plaintiff earned the following income from 1996 through 2014, shown in both actual and indexed earnings:

| Year | Actual Earnings | Indexed Earnings |
|---|---|---|
| 1996 | $ 842.00 | $ 1,343.06 |
| 1997 | 462.50 | 697.05 |
| 1998 | 695.25 | 995.73 |
| 1999 | 135.00 | 183.14 |
| 2000 | 2,516.29 | 3,234.69 |
| 2001 | 4,455.96 | 5,594.66 |
| 2002 | 3,903.07 | 4,851.82 |
| 2003 | 3,264.60 | 3,961.32 |
| 2004 | 10,971.21 | 12,721.26 |
| 2005 | 8,054.94 | 9,010.13 |
| 2006 | 21,869.75 | 23,388.16 |
| 2007 | 18,462.90 | 18,887.62 |
| 2008 | 30,265.50 | 30,265.50 |
| 2009 | 52,494.92 | 52,494.92 |
| 2010 | 35,844.54 | 35,844.54 |
| 2011 | 479.92 | 479.92 |
| 2012 | 7,626.95 | 7,626.95 |
| 2013 | 0.00 | 0.00 |
| 2014 | 0.00 | 0.00 |

(Tr. at 141-147, 152-153).

**Function Report**

In a Function Report dated July 27, 2012, plaintiff described his day as taking his dogs out, giving them food and water, doing a load of laundry, doing the dishes, and watching television until evening. He would help his wife cook dinner, clean up, watch more television, and then go to bed (Tr. at 208). Plaintiff did not report any difficulty with personal care except that he indicated he no longer takes showers because he does not want to stand (Tr. at 209). Plaintiff indicated he would go out once or twice a

5

day, and he would either ride in a car or drive (Tr. at 211). He was capable of going out

alone (Tr. at 211). He shopped in stores for groceries for an hour at a time (Tr. at 211).

Plaintiff's condition affects his ability to lift, squat, bend, stand, reach, walk, sit,

kneel, climb stairs, complete tasks, concentrate, and use his hands (Tr. at 213). He

can walk for 30 minutes before needing to rest for an hour (Tr. at 213). When asked

how long he can pay attention, he wrote, "depends on the activity involved" (Tr. at 213).

## B.   SUMMARY OF TESTIMONY

During the January 28, 2014, hearing, plaintiff testified; and Denise Weaver, a

vocational expert, testified at the request of the ALJ. Ms. Weaver's testimony is

discussed in section VII. below.

Plaintiff had an accident on August 3, 2010, while employed with UPS. He was

25 years of age at the time. Plaintiff currently lives in a house with six stairs going

upstairs and six going down (Tr. at 34). Upstairs are the bedrooms, living room and

kitchen, and he takes those stairs every day (Tr. at 34). Plaintiff is married and his wife

works (Tr. at 34-35). They live with plaintiff's parents (Tr. at 44). Plaintiff received

worker's compensation benefits after his accident in 2010 until February 2012 (Tr. at

35). He applied for unemployment benefits but was denied because he was not able to

work (Tr. at 35).

Plaintiff has a driver's license but he drives very little (Tr. at 35). No doctor has

limited his driving, but he does not feel safe driving due to his pain (Tr. at 35-36).

Plaintiff's wife or his parents usually drive him (Tr. at 35-36).

Case 2:15-cv-04292-REL   Document 27   Filed 03/31/17   Page 6 of 41

Plaintiff completed 2 1/2 years of college (Tr. at 36). He last worked in July 2012 -- he was a night stocker at HyVee for two weeks (Tr. at 36). Before that he last worked at UPS on August 3, 2010 (Tr. at 36).

Plaintiff has both dull and sharp pain in his ankle; sometimes he feels like he is being stabbed with a knife (Tr. at 37). It radiates up his right leg and into his right hip and lower back (Tr. at 37). On average plaintiff's pain is a 6 to 7 out of 10 in severity (Tr. at 37). Plaintiff is currently taking Oxycodone (narcotic) for his pain (Tr. at 38). Pain medication does not work all the time (Tr. at 38). Plaintiff elevates his legs and rests (Tr. at 38). If the pain is radiating up his leg, he cannot sit for long and needs to be able to stand up "whenever he needs to" because of pain (Tr. at 38). Alternating between sitting and standing can help ease his pain; he also uses ice (Tr. at 38).

The weather exacerbates plaintiff's pain, standing for longer than 15 or 20 minutes exacerbates the pain (Tr. at 39). He can walk for 40 yards at a time (Tr. at 39). Plaintiff had a cane at the hearing but said it was not prescribed by a doctor (Tr. at 39). He was using crutches when he went to see the doctor and switched to a cane because it is easier for him to get around (Tr. at 39). He can lift 8 to 10 pounds but he cannot carry anything further than 10 or 15 feet (Tr. at 39).

Plaintiff does not do laundry because he has to go downstairs to access the washer (Tr. at 40). The only cooking plaintiff can do is with a crock pot and without much preparation -- 20 to 25 minutes (Tr. at 40). Plaintiff does not go grocery shopping, he does not work out, and he engages in no social activities (Tr. at 44). Plaintiff does not go out much because he is afraid to take the risk that someone will

7

step on his foot (Tr. at 51). Plaintiff wakes up at least once every hour due to pain or discomfort (Tr. at 51-52). Plaintiff was given prescription medication for that, but he was unable to take it because it impacted his ability to concentrate and focus (Tr. at 52). He was prescribed Gabapentin for this, but when he took it he was unable to remember his friend's name, and they had known each other since they were nine years old (Tr. at 52). Tramadol made his pain worse and he was unable to get out of bed until 4:00 the next afternoon when he took it the night before (Tr. at 52).

Plaintiff is unable to work because his pain is so bad that he cannot concentrate or focus (Tr. at 41). Icing and elevating his legs to keep the swelling down takes a good part of the day -- he does this four times a day for 30 minutes at a time (Tr. at 41). While he is icing his ankle, he watches television or plays a game on his phone (Tr. at 45-46). If plaintiff skips a day of elevating his feet and using ice, he suffers from "fairly significant swelling" and a lot more pain (Tr. at 49). Plaintiff has to elevate his feet above his head (Tr. at 49). Plaintiff has talked to Dr. Corcoran about this need to elevate his feet, and the doctor agrees (Tr. at 49-50). Sometimes plaintiff's pain is so bad that he doesn't watch television when he's icing -- he can't think about anything but the pain, it consumes everything he is doing at the time (Tr. at 51).

Getting up and getting ready for the day takes a lot longer than it used to (Tr. at 41). Plaintiff had to put a bench in the shower so he can sit down (Tr. at 41-42). Dressing himself is very difficult because he is so stiff, plus his lack of range of motion makes it difficult (Tr. at 42). His hips are stiff and he cannot pick his legs up and bend his knees to put his pants on (Tr. at 42). Putting shoes on is very difficult because he

has to unlace his shoe almost all the way, slide his foot in, and then re-lace the shoe due to very little range of motion (Tr. at 43).

Plaintiff's ankle pain, knee pain and hip pain have been getting worse since his accident (Tr. at 43). The difficulty with getting dressed has gotten worse over time as well (Tr. at 43). His only treatment right now is medication (Tr. at 46). His doctor recommended a fusion but it would cost $1,400 and plaintiff is still applying for financial assistance (Tr. at 47-48). Plaintiff lost his insurance when he had his accident, and since then he has been going to the Family Health Center which is $40 a visit (Tr. at 53).

Plaintiff was supposed to do a work hardening program, but he could not complete the tasks they had asked him to do every day because the pain was too great (Tr. at 65). He was supposed to participate five days a week four hours per day, but he could not get through a four-hour period let alone every day of the week (Tr. at 65).

## C.    SUMMARY OF MEDICAL RECORDS

On August 3, 2010, plaintiff was in an automobile accident and was taken by ambulance to the hospital (Tr. at 272, 282). Plaintiff was treated and discharged with crutches and an air cast on his right ankle (Tr. at 273, 275). He was given a prescription for Percocet (narcotic) (Tr. at 275). The following day Robert Koch, M.D., Emergency Director, wrote a letter to plaintiff's employer, UPS, indicating that he should be off work until August 7, 2010:

> Based on my review of the emergency record I would advise Mr. Bradley to avoid being in a sitting or standing position due to the coccyx fracture for 72 hours from

this date. This is to help with the pain that Mr. Bradley will have with pressure on the coccyx area.

Even after this time Mr. Bradley may have to avoid prolong[ed] sitting and standing due to pain. I would have Mr. Bradley return to your workman's compensation physician or the physician of your choice to further determine if any further restrictions are going to be needed.

(Tr. at 251).

On August 9, 2010, plaintiff saw Warren Todd Cooper, M.D., for a follow up on his ER visit (Tr. at 322-325). Plaintiff reported sharp pain in his tail bone radiating to his left leg. Sitting and lying flat aggravated his pain. Plaintiff also reported feeling lightheaded while standing, aggravated by rapid rise. On exam plaintiff had tenderness and muscle spasm in his back. Straight leg raising was positive. He had moderate pain in his lumbar spine with motion. No edema was noted in his extremities. He was assessed with fracture of the coccyx. Because the ER doctor could not give a positive diagnosis of the ankle due to swelling at the time, Dr. Cooper ordered repeat imaging and told plaintiff to continue to be non-weight bearing in the meantime. He was told to continue taking Percocet every six hours as needed.

On September 10, 2010, plaintiff saw Brian Schultz, M.D., an orthopedic specialist, for evaluation of his tail bone pain which plaintiff reported was exacerbated by sitting (Tr. at 718-719). Plaintiff presented in an air cast and using crutches. "When he is sitting on the table he puts all of his weight on the right side of his body." Plaintiff was given a prescription for a donut seat to take the pressure off the coccyx. "He is really not going to be able to drive for the next six to eight weeks due to pain associated with this. Discussed the long term prognosis with Brent. These can often go on to

10

produce pain in the tail bone for a considerable period of time following the injury.

Other options that may be required in the future would include local cortisone injection

and possibly coccygectomy [surgical removal of the coccyx] if he does not have

improvement."

On September 23, 2010, plaintiff had an MRI of his right ankle (Tr. at 393). It

was discovered that plaintiff had a fracture of the talar dome with reactive marrow

edema and no displacement. The fracture

extended to the sinus tarsi where edema was

seen.



On September 24, 2010, plaintiff saw

Brian Schultz, M.D., an orthopedic specialist,

for a follow up (Tr. at 717). Dr. Schultz

reviewed the MRI which showed no

displacement. "Treatment for the [ankle]

fracture is . . . nonweightbearing short leg cast with crutches. . . . Treatment for the

coccyx fracture remains unchanged from those detailed in his previous visit." Plaintiff

had not yet obtained a donut seat.

On October 22, 2010, plaintiff saw Brian Schultz, M.D., an orthopedic specialist,

for a follow up (Tr. at 716). Plaintiff continued to use Vicodin (narcotic) for his lower

back pain and reported no help with a donut seat. Plaintiff's ankle cast was removed

and he was switched to an immobilization boot. X-rays showed no displacement.

Plaintiff was told to begin range of motion and early strengthening exercises. His

11

Vicodin was renewed.  Dr. Schultz prepared a form for plaintiff's employer indicating that plaintiff could do no prolonged sitting or standing; no repetitive bending, twisting or stooping; and no walking over 30 yards (Tr. at 740).

On November 5, 2010,  plaintiff saw Warren Todd Cooper, M.D., at Columbia Family Medical Group (Tr. at 319-320).  Plaintiff complained of upper, middle and lower back pain.  On exam plaintiff had tenderness in his spine.  Dr. Cooper noted muscle spasm in the thoracic and lumbar spine along with "mild pain with motion."  He assessed back pain and prescribed Flexeril (muscle relaxer), Medrol (steroid), and Vicodin (narcotic) (Dr. Shultz had given plaintiff a prescription for Vicodin 2 1/2 weeks earlier).

On November 12, 2010, plaintiff saw Brian Schultz, M.D., an orthopedic specialist, for a follow up (Tr. at 715).  On exam plaintiff had swelling and tenderness in his ankle and tenderness in his lower back.  Dr. Schultz recommended a steroid injection in plaintiff's lower back and told plaintiff to continue using the boot for four more weeks.  Plaintiff's Vicodin was refilled (Dr. Cooper had given plaintiff a prescription for 30 tablets of Vicodin one week earlier).

On November 24, 2010, plaintiff had a cortisone injection in his sacroiliac joint (Tr. at 721-722).

On December 10, 2010, plaintiff saw Brian Schultz, M.D., an orthopedic specialist, for a follow up (Tr. at 714).  Plaintiff reported no lasting relief from the cortisone injection.  He continued to use Vicodin (narcotic) mostly at night and was taking ibuprofen during the day.  Plaintiff reported his ankle pain as being a bit worse.

12

On exam Dr. Schultz observed that the ankle swelling was much improved from the previous visit. Plaintiff continued to have ankle tenderness. Straight leg raising was negative. Dr. Schultz recommended a CT scan. "I think we need to try to get him out of his boot and into physical therapy to work on his range of motion. I think the fact that he has been immobilized for so long is contributing substantially to his pain but I want to be sure the fracture is completely healed before we enroll him in physical therapy." Plaintiff's gait and sitting posture had been altered due to his coccyx fracture. Dr. Schultz refilled plaintiff's Vicodin (narcotic). He prepared a form for plaintiff's employer indicating that plaintiff could do no repetitive bending, no repetitive twisting, no repetitive stooping, no prolonged standing, and no driving (Tr. at 738).

On December 14, 2010, plaintiff had a CT scan of his right ankle (Tr. at 720).

On December 15, 2010, plaintiff saw Brian Schultz, M.D., an orthopedic specialist, for a follow up on the CT scan of his ankle (Tr. at 713). Plaintiff continued to report pain and no change in his symptoms, including continued pain in his tail bone while sitting. No exam was performed. The CT scan showed degenerative changes in the ankle and disuse osteoporosis associated with prolonged immobilization. Plaintiff was told to transition out of the boot and to begin physical therapy.

On January 21, 2011, plaintiff saw Brian Schultz, M.D., an orthopedic specialist, for a follow up (Tr. at 712). On exam plaintiff had tenderness in his ankle and his coccyx/sacroiliac joint area. He had full range of motion in his lower back.

He has made excellent progress in terms of range of motion. He still has a ways to go with getting his <span style="color:blue">dorsiflexion</span> back. I also think we need to continue to work on his strength and proprioception.[1] He needs another course of physical therapy. . . . He is fit for an ASO brace today [for his ankle] to improve his lateral stability and control some motion at the sacroiliac joint. No new treatment recommendations for the sacroiliitis in the coccyx.

On March 9, 2011, plaintiff saw Brian Schultz, M.D., an orthopedic specialist, for a follow up (Tr. at 711).



He has been to therapy for the last six weeks. He is clearly making improvement in his function and his pain. He is still limping. He still has pain in his tail bone as well. He asks if there is any other medication besides the ibuprofen. He does not feel like it is really helping much.

Dr. Schultz noted plaintiff's antalgic gait. Plaintiff was able to walk on his heels with minimal difficulty. He could stand up on the balls of his feet with some difficulty and walk on his toes but with considerable pain. There was no swelling in the right ankle but there was some tenderness. Plaintiff had tenderness to palpation at the coccyx.

Discussed with Mr. Bradley he has made considerable improvement with the therapy over the last six weeks which improves his prognosis considerably. My hope is that with the therapy and more weight bearing on this foot the disuse osteoporosis will resolve and his pain will improve. I do not anticipate much change in terms of the subtalar joint pain. I am hopeful that as he strengthens up the tendons at the lateral aspect of his ankle he will get some improvement in his stability.

---

[1]The ability to sense stimuli arising within the body regarding position, motion, and equilibrium.

Dr. Schultz prepared a form for plaintiff's employer indicating that he was not at maximum medical improvement but was expected to be by May 1, 2011 (Tr. at 735). He released plaintiff to return to work but with no lifting over 25 pounds, no prolonged standing, no walking more than 25 yards, and no driving (Tr. at 735).

On April 20, 2011, plaintiff saw Brian Schultz, M.D., an orthopedic specialist, for a follow up (Tr. at 710). Plaintiff reported minimal change. "He still has pain to walk. He is still limping. He is not driving." On exam plaintiff had no swelling. He had full passive range of motion with dorsiflexion, plantar flexion, internal and external rotation of the ankle.[2] His examination was normal except strength was 4/5. His had full motion with passive hip extension and normal range of motion in both hips. Dr. Schultz had x-rays taken. He assessed a healed right ankle talus fracture with resultant osteoarthritic change and "disuse osteoporosis from prolonged immobilization." He also assessed coccyx fracture.

> With respect to the coccyx would anticipate some change once he can restore his normal gait. However other than that I would not anticipate a whole lot of change on that. We are not doing any new treatment for the coccyx injury. With respect to the talus fracture he still has quite a bit of osteopenia[3] noted on the plain films. I would like to give him another four months or so of walking on this to see if that can improve. We discussed calcium intake as well. I would like to see him back in early August. . . . I am going to begin to lift his restrictions. He

---

[2]This was an improvement from his previous visit on March 9, 2011, when he had 30 degrees of dorsiflexion, 40 degrees of plantar flexion, 30 degrees internal rotation and 15 degrees external rotation (Tr. at 711). On January 26, 2011, he had 10 degrees of dorsiflexion, 40 degrees of plantar flexion, 15 degrees of external rotation, and 30 degrees of internal rotation (Tr. at 712). On December 10, 2010, he had 5 degrees of dorsiflexion, 20 degrees of plantar flexion, 10 degrees of internal rotation, and 10 degrees of external rotation (Tr. at 714).

[3]Reduced bone mass of lesser severity than osteoporosis.

15

has concerns about this and says he cannot walk more than an hour a day and has concerns about performing a 12 hour shift on his feet.  He is safe to go ahead and drive provided he is not taking narcotic pain medications.  I set his restrictions at no climbing ladders or working at heights and limiting his walking to four hours per shift.  Following that visit in August it may be necessary to perform a functional capacity evaluation to determine what he is capable of performing in terms of job duties in the future.

(Tr. at 710).

Dr. Schultz prepared a form for plaintiff's employer, indicating that although he was not at maximum medical improvement, he was expected to reach that by August 1, 2011 (Tr. at 734).  He released plaintiff to return to work but with no climbing ladders, no working at heights, and limiting his walking to 4 hours per shift.

On July 6, 2011, plaintiff saw Brian Schultz, M.D., and complained that he was walking a few days ago and felt a sharp pain through his ankle (Tr. at 772).  He said he stepped on it wrong, and his pain had persisted.  Plaintiff was observed to be limping and was unable to bear weight on his right foot.  He was exquisitely tender to palpation. X-rays were obtained and an MRI was ordered.  Dr. Schultz indicated that plaintiff could work but would need to change position at will and could do no prolonged standing and no walking over 25 yards (Tr. at 790).

An MRI was obtained on July 11, 2011 (Tr. at 777).  It showed marked improvement and near-complete healing with almost no residual after effect of the talar fracture.  "Question minimal fluid at the talofibular joint, anterior talofibular ligament is suspect, possibly a chronic tear not well seen, but otherwise no acute abnormality."

The next day, on July 12, 2011, plaintiff saw Dr. Schultz for a follow up (Tr. at 771).  Plaintiff reported difficulty walking; he said he does not feel like his ankle is stable

and it "wants to give out on him frequently." On exam plaintiff had mild swelling and mild tenderness. He had full passive range of motion and 4/5 strength. "[H]is talus fracture has healed nicely. I do not see much in the way of severe degenerative change at the subtalar joint. I would recommend that he continue use of his ASO brace, continue working on his lateral stabilization program for his ankle. . . . No work restrictions given today. The importance of strengthening and proprioception exercises was emphasized to the patient today." Dr. Schultz released plaintiff to return to work with no restrictions (Tr. at 789).

On July 29, 2011, plaintiff saw Brian Schultz, M.D., orthopedic specialist, for a follow up (Tr. at 770, 788). "At this point he feels like he still cannot trust his ankle. He is able to return to his previous activities. He does not have confidence that he can walk and make the deliveries that he was previously making without rolling his ankle and having ankle pain. Over the last week he tried swimming. He tried walking his dog but developed swelling and pain in his ankle to the point that he was on crutches because of the pain." Dr. Schultz noted that plaintiff's gait was antalgic and "very hesitant." He was able to bear weight on the right ankle "though again with considerable hesitancy and difficulty moving up into a position of plantar flexion." Dr. Schultz saw no swelling; plaintiff had full passive range of motion. "These motions produce more pain than would be anticipated this far out from his injury." Dr. Schultz referred plaintiff to Brian Kleiber, M.D., to discuss whether surgery would be appropriate for the instability. Dr. Schultz released plaintiff to return to work except he could not climb ladders or walk on uneven ground.

On August 16, 2011, plaintiff saw Brian Kleiber, M.D., an orthopedic surgeon in Dr. Schultz's office, for evaluation of his right ankle (Tr. at 768-769, 787). Plaintiff reported that his ankle gives out, and that he experiences pain both at rest and when weight bearing. Plaintiff's current medications were Meloxicam (non-steroidal anti-inflammatory) and Tramadol (a narcotic-like pain reliever). Plaintiff denied all other complaints. Dr. Kleiber reviewed plaintiff's x-rays from his last appointment with Dr. Schultz and noted that the right ankle is well aligned without significant degenerative change. He reviewed plaintiff's CT scan and found that plaintiff may have either degenerative change or a very small coalition on the medial subtalar joint. He reviewed an MRI which showed that bony structures and tendinous structures were intact. Dr. Kleiber recommended a steroid injection. "I think as far as work is concerned, he would be able to do driving. I think he may be limited in his lifting capacity, but I think he would be limited to no more than 20 lbs."

On September 15, 2011, plaintiff saw Brian Kleiber, M.D., orthopedic specialist, for a follow up (Tr. at 767). "He has some unusual symptoms. He said the injection was very painful the first day, but then it was about 50% better for maybe 10 days after that. He still has a lot of pain. It hurts even at rest. It is worse with activity. He has been off work for over one year now as a result of this injury. He also has ankle instability which has been ongoing and worsened by this problem." Plaintiff rated his pain as "quite severe." He had some limited strength due to guarding. X-rays were obtained and showed no obvious new findings. "I think what we are seeing is an ankle which looks to be in good condition without malalignment. The subtalar joint is

18

preserved. I did go back and look at his CT scan. The medial facet changes, I am wondering if that is evidence of a small coalition. I am trying to figure out exactly why he is having so much pain." Dr. Kleiber assessed right ankle and hind foot pain, questionable sinus tarsi pain, and ankle instability.

> Brent is a little bit of a tough diagnosis. He has way more pain that I would expect given the amount of pathology I am seeing. However, I think there is some mechanical reason why he is having pain. . . . He states that his pain goes clear up his leg and up into his hip and I think that is a little excessive. . . . I think a bone scan to see if it highlights that area as being active and involved in an injury would be helpful to make a further diagnosis.

On September 29, 2011, plaintiff saw Brian Kleiber, M.D., orthopedic specialist, for a follow up on his bone scan (Tr. at 765). Plaintiff rated his pain as fairly severe. He was assessed with right ankle and hind foot pain, questionable sinus tarsi pain, and ankle instability.

> Brent poses a little bit of a diagnostic challenge. He has a lot of pain and admittedly more so than what I would expect given the findings. However, we have a CT scan which showed evidence of medial facet abnormality possibly an old coalition at least to my viewing. He has a bone scan now which shows increased activity in that area and he has an injection which provided him with some relief. I think there is some evidence that would lead us to think that at this point it has been going on for one year. He has failed conservative treatment thus far. . . . [W]e spent a lot of time trying to figure out the source of his pain as I do not feel like ankle instability is necessarily the source of pain in and of itself. At this stage, it has been going on for more than one year. I think we have evidence that supports the subtalar joint specifically the medial facet as the source of his pain. I think [surgery] is something that may help him. However, unfortunately I cannot guarantee that he is going to get 100% pain relief. At this stage, he is willing to try just about anything. He feels as though he needs to get back to work and I would tend to agree with this.

On October 10, 2011, Brian Kleiber, M.D., performed surgery on plaintiff's ankle (Tr. at 779-782).

19

On October 25, 2011, plaintiff saw Amy Sanders, a registered nurse/physician's assistant in the office of Dr. Kleiber, for a follow up (Tr. at 761). Plaintiff was noted to be doing quite well and had no complaints. Ms. Sanders removed some of plaintiff's sutures and placed him in a short leg cast. "He is going to remain nonweightbearing and continue to ice and elevate as needed for swelling and pain." Plaintiff was kept off work until his follow up in two weeks.

On November 8, 2011, plaintiff saw Amy Sanders, a registered nurse/physician's assistant in the office of Dr. Kleiber, for a follow up (Tr. at 757). "He is much improved. He is not using any pain medications and is ready to get back to therapy at least." Plaintiff's strength was 5/5. Sutures were removed.

> He was very interested in going into a boot at this point and using it as a cast. However, I reviewed with Dr. Kleiber and due to his continued problems with his ankles, we are going to play this by the book. He is going to continue in a cast for the next couple of weeks. He needs to remain nonweightbearing. . . . He can continue . . . to ice and elevate as needed for swelling and pain. We will see him back in two weeks and hopefully be able to move him to a brace at that time and progress him quickly through physical therapy and back to a working status.

Plaintiff was released to return to work with the following restrictions: "Strict sit down work only with leg elevated to waist level. Continue non-weight bearing until follow up in 2 weeks." (Tr. at 758).

On November 22, 2011, plaintiff saw Brian Kleiber, M.D., an orthopedic specialist, for a follow up (Tr. at 753). "He reports that he is doing quite well. He is not really having much difficulty. He is staying off his foot. The cast was removed today." His range of motion was good, ankle was stable, strength was "coming along." X-rays showed no fracture and no complications. "We are going to start some physical

20

therapy for gentle nonweightbearing range of motion and strengthening. . . . From a work standpoint, he is at light duty. No commercial driving and limit his standing and walking [to] no more than four hours per shift." Plaintiff had no sitting limitations (Tr. at 754-755).

On December 22, 2011, plaintiff saw Brian Kleiber, M.D., orthopedic specialist (Tr. at 752, 786). "Brent Bradley reports that he is doing okay. He has gotten off the crutches. He is making some slow and steady progress. He has not been working, however." Plaintiff's ankle range of motion was good. He has "a little bit of discomfort" around the ankle.

> Brent is going to go from the boot into an ASO brace. I want him to make that transition with therapy. He is to increase his aggressiveness of his physical therapy and continue to work hard. I gave him a new note for work that says he can do a limit of four hours standing and walking. I think it is okay for him to drive commercially. We will put a 25-lb. weight limit on him as far as lifting and carrying.

On January 24, 2012, plaintiff saw Brian Kleiber, M.D., orthopedic specialist, for a follow up (Tr. at 748). "He has been going a little slow in his rehab." X-rays were obtained and showed no obvious changes, no evidence of complication or fracture, no other degenerative changes.

> We are going to see if we can kick start his rehab. We will get him a Medrol Dosepak [steroid] to get him a little jump start of his anti-inflammatory action. We will refill his ibuprofen. We will get him a new prescription for therapy where they can really work on edema control as well as work hardening. . . . I did give him work restrictions to allow him to do four hours a shift standing and walking. He can drive. He can lift up to 20 lbs. I think the next time we need to see some serious progress.

Dr. Kleiber prepared a form for plaintiff's employer indicating that plaintiff could return to work but had to limit his standing and walking to 4 hours per shift, otherwise he should have sit-down duties (Tr. at 749). He was limited to lifting and carrying 20 pounds and could drive.

On February 23, 2012, plaintiff saw Brian Kleiber, M.D., orthopedic specialist, for a follow up (Tr. at 743-744).

> The last time we saw him he was going pretty slowly and we had gotten him a Medrol Dosepak and we tried to get him to kick start his rehab. We had him do some edema control and work hardening. We had allowed him to do up to four hours a day standing and walking per shift. He could drive and he could lift 20 lbs., but he has not really been working. What we are also learning is that he has not been going to therapy either and all total he cancelled or no-showed for 12 therapy appointments. He states it is because of pain and swelling that he is unable to do it. When questioned about his recovery, he states that his stability is better and he has less pain at rest most of the time, but he still has pain. He points to an area in his posterior hind foot which gives him a sharp stabbing pain around the lateral calcaneus. This is a new area that has never been a problem previously. . . . He says that his pain gets to the point where he considered going to the hospital.

On exam Dr. Kleiber noted mild to moderate swelling around the ankle and hind foot. X-rays were reviewed and showed no changes over the last several visits. Dr. Kleiber assessed "minimal progress and recovery."

> I think it is very hard to make judgments considering that he has been doing bad enough that he states that he has not been able to attend his therapy sessions and has cancelled at least 12 of them per the records of the therapy office, but at no point did he call for another evaluation or to be seen. At this point, I think that with no other further interventions planned and the fact that he is not following through with his postoperative protocol, I think there is no absolute reason why he could not return to work at full capacity based on his job description. Therefore, I think we should return him to work at full capacity. I think we can hold off on maximum medical improvement at this time, but I do feel like it is

22

either a matter of he is going to get better or he is not. Right now, I do not have anything planned to intercede with that because there are not a lot of objective findings; all of his findings are purely subjective at this juncture.

On February 27, 2012, plaintiff saw Siamac Vahabzadeh, M.D., an orthopedic specialist (Tr. at 839-840). He complained of right ankle pain with an onset 18 months earlier. "It occurs constantly and is stable." Plaintiff said his pain is aggravated by movement, walking and standing. There were no relieving factors.

> Pt. is here for second opinion. Pt. saw Dr. Kleiber for his work comp. Pt. has been following Dr. Kleiber for 18 months and had surgery with minimal benefits. Pt. states that at last encounter Dr. Kleiber expressed that he felt Pt. could return to work at full duty with no further recommendations that would benefit Pt. Pt. felt with current continued right ankle symptoms that he is still not able to fully perform his work responsibilities.

On exam plaintiff reported moderate pain with motion. Dr. Vahabzadeh observed mild swelling. He recommended a more comprehensive exam by an occupational health expert to assess plaintiff's functional abilities and limitations. He told plaintiff if functional limitations were identified, he could get a second opinion from a different ankle specialist to see if any further treatment options were available to improve his overall function.

On March 27, 2012, Brian Kleiber, M.D., released plaintiff to return to work without restrictions (Tr. at 785). He was noted to be at maximum medical improvement.

On May 18, 2012, plaintiff saw Kyle Fiala, DPM, for evaluation of his right ankle (Tr. at 385-387). Plaintiff reported persistent pain to his right ankle and foot, aggravated with prolonged periods of weight-bearing activity. "It is relieved with rest." Plaintiff was not currently pursuing any treatments. He had no other complaints at that

23

time.  Plaintiff had an antalgic gait.  He had mild swelling to the right hind foot.  He had

pain to palpation to the subtalar joint, but none with palpation to the right ankle joint.

Range of motion was slightly decreased.  There was no gross instability noted.  Muscle

strength was 5/5.  X-rays were obtained, no fractures or cortical defects were noted.

Alignment was appropriate.  There was evidence of degenerative arthrosis (also called

osteoarthritis) to the right subtalar joint.  There appeared to be sclerosis (hardening of

tissue) and possible loose bodies within the subtalar joint.  Dr. Fiala recommended a

CT scan and a diagnostic injection to determine where the pain was coming from, and

he performed the injection that day.

On May 29, 2012, plaintiff saw Dr. Fiala, podiatrist, for a follow up (Tr. at 380-

381, 378-379).  Plaintiff had severely decreased range

of motion to the right subtalar joint mainly with inversion.



**Inversion and Eversion**



- **Inversion**: turning the ankle so the plantar surface of foot faces medially
- **Eversion**: turning the ankle so the plantar surface of foot faces laterally

Eversion    Inversion
8-27

“We discussed both again conservative and surgical

treatment options.  He is leaning more towards surgical

treatment. . . . .  I would like to send him for a CT scan

to further evaluate the ankle and hind foot complex.  He

will return to the clinic for his preoperative appointment.”  Plaintiff’s CT scan showed

multiple loose bodies in the joint, degenerative changes, and tendinitis.

Seven months later, on December 31, 2012, plaintiff saw Blake Corcoran, M.D.,

at the Family Health Center to establish care (Tr. at 999-1002).  Plaintiff reported that

he had had chronic ankle pain since his injury in 2010, that “pain causes serious

disability, unable to work prior job w/UPS.  Able to stand/walk 3 hours w/cane or 1 hour

24

w/o."  Plaintiff said he was "receiving surgery" but lost his insurance before it was
completed.  Plaintiff described his ankle pain as an 8/10 in severity with activity,
alleviated some by using a cane.  "Causing significant disability for age and prior
functional ability."  A physical exam was performed but there is no indication in the
notes of physical exam that plaintiff's back or ankle were examined.  In a "comment,"
Dr. Corcoran wrote, "Loss of mobility of R ankle:  <5% active and passive inversion and
eversion [see diagram on page 24] of R ankle.  TTP [tender to palpation] talocalcaneal
joint. TTP [tender to palpation] of R SI [right sacroiliac] joint."




Dr. Corcoran assessed arthritis involving the ankle and foot, uncontrolled.  "Needs
operative treatment but is without coverage or ability to pay.  Encourage working with
lawyers to obtain coverage as this was a work related injury that was inadequately
treated."  Because there is no indication in this record that Dr. Corcoran reviewed any of
plaintiff's past medical records or imaging records, it appears that the comments about
needing surgery and receiving inadequate treatment came from plaintiff as opposed to
being Dr. Corcoran's medical opinion.  "Will try to alleviate pain by Tylenol, ibuprofen.
Discussed risks/benefits of chronic narcotics, opted to start Neurontin [narcotic-like pain

reliever]." He indicated he would consider adding Amitriptyline (treats nerve pain and depression) in two months.

On February 23, 2013, plaintiff saw Blake Corcoran, M.D., for a follow up (Tr. at 990-993). "Failed amitriptyline, tramadol. Cannot take NSAIDs due to history of erythema multiforme [a skin condition].[4] Tylenol insufficient relief." On exam plaintiff had no swelling. He reported back pain, joint pain and limited mobility of his right ankle. There is no further indication of an examination of his back or ankle. Dr. Corcoran assessed arthritis involving ankle and foot, poorly controlled. He prescribed Percocet, a narcotic, and told plaintiff to "follow up appeal to get insurance coverage and seek surgery."

On May 2, 2013, plaintiff saw Blake Corcoran, M.D., for a follow up and medication refills (Tr. at 986-989). "States no concerns at this time." Dr. Corcoran noted fair control of plaintiff's ankle and foot arthritis. "Pain is moderately well controlled with Percocet. He has been taking at least 1 tab daily, 2 on most days, and three on some. First 90 tabs lasted 45 days. Second 90 lasted 35 days." Plaintiff said he planned to go to court the end of May and get medical coverage so he could get surgical repair. Dr. Corcoran observed no joint swelling. He refilled plaintiff's Percocet through the end of June. "Discussed benefits of seeking manual physical therapy . . . after operative repair given extensive dysfunction." He started plaintiff on Cymbalta (treats nerve pain and depression).

---

[4]Plaintiff's previous medical records show that he was prescribed Meloxicam and Ibuprofen, both non-steroidal anti-inflammatories, without this side effect noted.

On May 27, 2013, James Stuckymeyer, M.D., an orthopedic surgeon, wrote a letter to plaintiff's lawyer (apparently in connection with his worker's compensation case) referencing a February 20, 2013, visit for an independent medical evaluation (Tr. at 950-960). Dr. Stuckymeyer reviewed plaintiff's medical records. Dr. Stuckymeyer was under the impression that plaintiff was "not taking any medications at this time" but Dr. Corcoran had prescribed Neurontin less than two months before this visit (Tr. at 957). Plaintiff was using a cane during his visit with Dr. Stuckymeyer.

> In summary, Mr. Bradley indeed represents a complicated orthopedic evaluation. . . . Mr. Bradley has received a 22.5% disability to the left ankle from a work-related accident, and I would concur with this Stipulation for Compromise Settlement disability rating. . . .
>
> At the time of this evaluation, I do feel the patient warrants ongoing significant work restrictions for the right ankle condition, and I would recommend no prolonged standing or walking greater than tolerated, with no walking on uneven surfaces, no working at heights, no climbing ladders. I would recommend work restrictions of no lifting to exceed 20-25 pounds below waist height for the persistent sacrococcygeal symptoms.

On July 1, 2013, plaintiff saw Dr. Corcoran for a follow up (Tr. at 982-985). Plaintiff reported the severity of his pain had increased. "He has also noticed lessening ankle stability when walking without assistance. Feels ankle rolls, inversion and eversion. Pain is incompletely well controlled with percocet, three times a day. Opiate requirement is increasing. Discussed risks and benefits of increasing dose. Hopefully getting coverage for surgery soon." Dr. Corcoran performed a physical exam and noted tenderness and reduced ankle range of motion. He increased plaintiff's dose of Percocet and refilled his Cymbalta.

On August 20, 2013, plaintiff saw Kyle Fiala, DPM, for a follow up (Tr. at 1004-1007). Dr. Fiala noted that at his last visit plaintiff was sent for a CT scan prior to scheduling surgery; he had the CT scan but never followed up. "He currently rates his pain 8/10. He has tried orthotics and bracing in the past with minimal relief." No swelling was noted. Plaintiff had little to no range of motion to the right subtalar joint; "any attempted manipulation elicits pain." Because plaintiff reported persistent chronic pain with conservative treatment, "I feel that more than likely he would benefit from [surgery]." Plaintiff was without insurance but was leaning toward surgical treatment. He wanted a little more time to think about it.

On August 21, 2013, plaintiff saw Dr. Corcoran for a follow up (Tr. at 978-981). Plaintiff reported constant left knee pain for the past two weeks, aggravated by walking, going up and down stairs, and weight bearing. He reported that his pain was alleviated by narcotic pain medication. He mentioned no recent trauma to the knee. On exam, plaintiff reported tenderness and pain. Plaintiff had stopped taking Cymbalta as he said it made him want to sleep all day. "Following now with Dr. Fiala at MOI and is starting with non-operative management, but is likely to require surgery. Still requiring Vicodin four times a day for somewhat normal function, but still requiring cane with prolonged walking/standing." Dr. Corcoran's physical exam was limited to noting that plaintiff's gait was antalgic. Dr. Corcoran refilled plaintiff's Percocet and told him to plan for manual physical therapy. He noted no clear cause of plaintiff's knee pain and referred him to Dr. Schultz for further assessment.

28

On October 17, 2013, plaintiff saw Dr. Corcoran for a follow up (Tr. at 974-977). Plaintiff reported worsening mood due to relying on his wife for financial support. His left knee pain was worsening and was exacerbated by increased time on his feet. He said he was unable to afford to see an orthopedic doctor. On exam plaintiff reported tenderness in his knee but Dr. Corcoran observed no swelling, normal strength and normal range of motion. Dr. Corcoran assessed poor control of ankle and foot arthritis because plaintiff said he was "always in pain." "Now causing right lower leg, upper leg, sacroiliac joint and lumbar pain/dysfunction. . . . Needs 3-5 percocets to maintain current functional level depending on the day." Dr. Corcoran increased plaintiff's narcotic pain medication.

On November 18, 2013, plaintiff saw Dr. Corcoran for a follow up and for medication refills (Tr. at 970-973). Plaintiff reported that his knee pain was exacerbated by increased time on his feet and exercising on a stationary bike. On exam he had no swelling, normal strength, no laxity, normal range of motion. Plaintiff reported increased pain now that he is working out; Dr. Corcoran refilled his narcotic pain medication, Percocet 4-5 tablets per day as needed for pain. "Court date in January; may be able to get surgery then." Dr. Corcoran reviewed an x-ray of plaintiff's knee which showed osteoarthritis.

On November 25, 2013, plaintiff saw Dr. Corcoran for a left knee steroid injection; "however, he is acutely ill and we will defer the injection until next visit." (Tr. at 965-968).

On February 7, 2014, Blake Corcoran, M.D., completed a "supplemental physician's assessment for social security claim" (Tr. at 1008-1009). He indicated that he advises plaintiff to elevate his feet during the day "if needed for comfort/swelling" for 20 minutes at a time, 0-2 times per day. He indicated ice or heat packs would be required "only if needed for swelling and discomfort." If he elevates his feet, they should be at "chair height." Dr. Corcoran answered that due to plaintiff's impairments and symptoms, it would be expected that plaintiff's ability to maintain attention and concentration would be interfered with to the point he would be off task for 10% of the day. He would be able to maintain attention and concentration for two-hour periods. A cane is recommended "if needed for pain, discomfort, swelling."

> Since Mr. Bradley's pain is expected to vary day to day, his impaired concentration will also likely vary. It is reasonable to expect his concentration to be impaired approximately 10% on average. However, once his ankle is surgically and definitely repaired, he should slowly regain his ability to concentrate with improvement in pain and function.

> Mr. Bradley has no absolute prohibitions to his activity, but he should guide his activity to maintain less than or equal to a tolerable and reasonable level of pain and avoid activity that leads to further impairment in function. It is reasonable to expect that with normal daily activity, he will develop pain and swelling, which may limit his function. Ice, elevation and using a cane may help alleviate his pain and swelling.

## V.    FINDINGS OF THE ALJ

Administrative Law Judge Renita Bivins entered her opinion on April 18, 2014 (Tr. at 12-21). Plaintiff's last insured date was December 31, 2016 (Tr. at 14).

30

Step one.  Plaintiff worked after his alleged onset date but his work did not rise to the level of substantial gainful activity (Tr. at 14).  He worked for two weeks in July 2012 as a night stocker at Hy-Vee (Tr. at 14).

Step two.  Plaintiff has the following severe impairments:  residual effects of a right ankle fracture and mild degenerative changes of the right ankle (Tr. at 14).  Plaintiff's injuries to his rotator cuff, right knee, left ACL tendon and left ankle resolved with treatment prior to his alleged onset date; therefore, they are not severe impairments impacting the plaintiff's ability to perform work for a continuous twelve-month period after his alleged onset date (Tr. at 14).  Plaintiff's fractured coccyx healed normally without complication and with only conservative treatment prior to the twelve full months needed to meet the duration requirement of a severe impairment (Tr. at 15).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 15).

Step four.  Plaintiff retains the residual functional capacity to perform less than a full range of sedentary work (Tr. at 15).  He can lift 10 pounds occasionally, stand or walk for 2 hours per workday, and sit for 6 hours per workday with normal breaks (Tr. at 15).  He cannot climb ladders, ropes or scaffolds, but he can occasionally climb ramps and stairs (Tr. at 15).  He can occasionally balance (Tr. at 15).  He must avoid concentrated exposure to hazardous machinery and must avoid all exposure to unprotected heights (Tr. at 15).  He must be allowed a sit/stand option (Tr. at 15).  With this residual functional capacity, plaintiff cannot perform his past relevant work as a package car driver (Tr. at 19).

31

Step five. Plaintiff is capable of working as a document preparer, dowel inspector, or patcher, all available in significant numbers (Tr. at 20).

## VI.    OPINION OF DR. CORCORAN

Plaintiff argues that the ALJ erred in giving limited weight to the opinion of plaintiff's primary care physician Blake Corcoran, M.D., specifically that plaintiff would be limited to walking 3 hours with a cane and 1 hour without a cane, would have to elevate his legs, and would have decreased ability to concentrate due to pain.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give the opinion including length of the treatment relationship and the frequency of examination; nature and extent of the treatment relationship; supportability, particularly by medical signs and laboratory findings; consistency with the record as a whole; and other factors, such as the amount of understanding of Social Security disability programs and their evidentiary requirements or the extent to which an acceptable medical source is familiar with the other information in the case record. 20 C.F.R. §§ 404.1527, 416.927.

Case 2:15-cv-04292-REL   Document 27   Filed 03/31/17   Page 32 of 41

The ALJ had this to say about the opinion of Dr. Corcoran:

> The claimant admitted at the hearing that his cane was not prescribed for him. Treatment records from his orthopedist and observations by the independent medical examiner reveal that the claimant's ankle condition has improved over time, which contradicts his allegations of worsening pain. Moreover, the claimant was not cooperative with his physical therapy, which leads one to question whether he is following treatment recommendations. . . . Finally, treatment records reveal that the degenerative changes in the claimant's ankle were mild in nature, which seems out of proportion to the aforementioned walking limitation and pain allegations. Therefore, I gave limited weight to these opinions.

(Tr. at 18-19).

1. *Length of the treatment relationship and the frequency of examination.* Plaintiff was treated by Dr. Corcoran for one year. He initiated care with Dr. Corcoran on December 31, 2012 -- almost 2 1/2 years after his alleged onset date. He saw Dr. Corcoran fairly regularly during 2013 (7 times essentially for medication refills).

2. *Nature and extent of the treatment relationship.* Dr. Corcoran, a family practice physician, did not treat plaintiff for his ankle or coccyx impairments other than to provide pain medication.

3. *Supportability, particularly by medical signs and laboratory findings.* During plaintiff's first visit with Dr. Corcoran, plaintiff said that his pain causes serious disability, and he is unable to stand or walk for more than 3 hours with a cane or for more than 1 hour without a cane. This statement appears in all of plaintiff's future medical records with Dr. Corcoran. Dr. Corcoran's records do not indicate that he obtained and reviewed plaintiff's other medical records or imaging studies. None of Dr. Corcoran's records indicate that he ever ordered any tests or imaging studies of plaintiff's ankle, foot or back. In November 2013, he had an x-ray taken of plaintiff's

knee after plaintiff began requesting additional narcotic pain medication due in part to knee pain with no known cause. In all of Dr. Corcoran's medical records, the only abnormal examination finding is tenderness. Plaintiff never had swelling in any part of his body when Dr. Corcoran performed examinations. Dr. Corcoran never noted any deficiency in plaintiff's ability to focus or concentrate. And he never recommended that plaintiff elevate his feet to aid in pain control or to alleviate swelling. The content of Dr. Corcoran's records supports the ALJ's finding that Dr. Corcoran's opinion is based almost entirely on plaintiff's subjective complaints.

    4. *Consistency with the record as a whole.* Dr. Corcoran's opinion differs significantly from those of plaintiff's treating specialists. As early as April 2011, Dr. Schultz indicated that plaintiff could work so long as he limited his walking to 4 hours per shift. Plaintiff had no sitting limitations, no concentration limitations, and no requirement that he elevate his feet or take breaks beyond that normally provided in a typical work day. In July 2011, Dr. Schultz indicated that plaintiff would need to change position at will, could do no prolonged standing, and could not walk more than 25 yards at a time; however, this was due to plaintiff having re-injured his ankle. After an MRI was done, Dr. Schultz (that same month) lifted those restrictions and released plaintiff to return to work with no restrictions. By the end of that month, defendant told Dr. Schultz he still needed crutches, and Dr. Schultz observed that plaintiff was "very hesitant" when bearing weight. However, Dr. Schultz indicated that plaintiff's allegations of pain were "more than would be anticipated this far out from his injury" and

released plaintiff to return to work with only the restrictions that he could not climb ladders or walk on uneven ground.

Dr. Kleiber, an orthopedic surgeon, took over care of plaintiff at this point and found from imaging that plaintiff's ankle was well aligned without significant degenerate change. He indicated that plaintiff could work but could not drive until his allegations of pain were addressed, and would be limited to lifting no more than 20 pounds. In September, Dr. Kleiber indicated that plaintiff has more pain that what Dr. Kleiber would expect given the findings. Dr. Kleiber agreed to perform an additional surgery due to plaintiff's complaints of pain. After the surgery, plaintiff was released to return to work while seated and with his leg elevated at waist level for the next two weeks. By the next month, Dr. Kleiber released plaintiff to work a full day with no commercial driving and limiting his standing and walking to 4 hours per day. He had no sitting limitations. A few weeks later, Dr. Kleiber lifted the driving restriction. By four months after the second surgery, Dr. Kleiber noted that plaintiff had not participated in physical therapy as directed, claiming he was in too much pain but had not requested to be seen by the doctor as a result of that alleged pain. Plaintiff claimed that his pain was in a new part of his foot. Dr. Kleiber reviewed imaging studies from the past few visits and saw no changes. He released plaintiff to return to work with no restrictions. This was in February 2012, nearly a year before plaintiff initiated care with Dr. Corcoran. In May 2012, plaintiff saw a podiatrist and indicated he wanted to have another surgery; the podiatrist wanted to discuss both conservative treatment and potential surgery

35

and recommended that plaintiff get a CT scan and return. Plaintiff got the scan but did not follow up with the podiatrist.

Seven months later was when plaintiff initiated care with Dr. Corcoran, who is not a specialist, and told him that he needed surgery but lost his insurance before he could get it, and that it was due to inadequate treatment. However, plaintiff had never returned to the podiatrist's office to discuss surgery after the CT scan was obtained, and there is nothing in any medical record suggesting that plaintiff's treatment was inadequate.

From that point on, plaintiff requested and received larger and larger doses of narcotic pain medication. Although plaintiff was able to work out and ride an exercise bike during this time, he never went back to participate in the physical therapy he had cancelled a year or more before and which his specialists had considered essential to a full recovery.

5. *Other factors, such as the amount of understanding of Social Security disability programs and their evidentiary requirements or the extent to which an acceptable medical source is familiar with the other information in the case record.* There is no indication in any of Dr. Corcoran's records that he ever reviewed any of plaintiff's orthopedic treatment records from the time of the accident to the time plaintiff became his patient.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision to discredit the opinion of Dr. Corcoran. The need to use a cane and limit walking to 1 to 3 hours per day came directly from plaintiff and

Case 2:15-cv-04292-REL   Document 27   Filed 03/31/17   Page 36 of 41

contradicts the opinions of plaintiff's treating specialists. Furthermore, a careful reading of Dr. Corcoran's opinion reveals that his limitations are not absolute. For example, he found that plaintiff should elevate his feet during the day "if needed for comfort/ swelling." It is notable that Dr. Corcoran found "no swelling" every time he examined plaintiff. This recommendation that plaintiff elevate his feet is purely subjective on plaintiff's part. Furthermore, Dr. Corcoran indicated that if plaintiff elevates his feet, they should be at chair height -- not above his head as plaintiff testified. And finally, in the last paragraph of Dr. Corcoran's narrative, he wrote, "Mr. Bradley has no absolute prohibitions to his activity." He merely stated that plaintiff should be the judge and only perform whatever activity he could that would not cause him undue pain. This is not a proper functional restriction, and the ALJ properly discounted it.

## VII.    VOCATIONAL EXPERT'S TESTIMONY

Plaintiff argues that the ALJ erred by relying on testimony from a vocational expert when the hypothetical presented to the vocational expert was different from the residual functional capacity found by the ALJ in her decision.

> First, it does not include any handing or fingering manipulation elements. Secondly, the hearing decision states that concentrated exposure to hazardous machinery must be avoided instead of a vague statement that the person [must] avoid hazardous machinery. Finally, it is unclear what is meant by a sit/stand option in the hearing decision. The hypothetical during the hearing indicated the hypothetical person should be able to have the ability to sit or stand at will while doing sedentary work as described. The hearing decision merely states that they would need the option but does not discuss frequency. The VE simply answered that based on a review of the tasks, the ability to sit or stand at will shouldn't be an issue. There was no discussion about the use of a cane.

Case 2:15-cv-04292-REL   Document 27   Filed 03/31/17   Page 37 of 41

A review of the job duties for each job indicates that a person would be at a work station or desk and it is unclear by a simple review whether a person would be able to perform those tasks while seated or standing at any given time.

(plaintiff's brief, page 15).

At the administrative hearing, the ALJ posed a hypothetical question to the vocational expert based on plaintiff's age, education, and a more limited residual functional capacity than that contained in her decision. He could never climb ladders, ropes, and scaffolds; could occasionally balance and climb ramps and stairs; needed to avoid concentrated exposure to hazardous machinery and all exposure to unprotected heights; and needed a sit/stand option. The hypothetical question included the following limitations in addition to those articulated in plaintiff's residual functional capacity: frequent fingering of objects as fine manipulation bilaterally, the ability to sit and stand at will, and the avoidance of hazardous machinery (defined as unshielded moving machinery). In response to the hypothetical question, the vocational expert testified that such an individual would be able to perform work as a patcher, dowel inspector, and document preparer.

An ALJ is required to include only those limitations in a hypothetical to a vocational expert which he finds credible. Gilbert v. Apfel, 175 F.3d 602, 604 (8th Cir. 1999); Sobania v. Secretary of Health Educ. & Human Servs., 879 F.2d 441, 445 (8th Cir. 1989); Rautio v. Bowen, 862 F.2d 176, 180 (8th Cir. 1988). The hypothetical is sufficient if it sets forth the impairments which are accepted as true by the ALJ. Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999) (holding that the ALJ need not include additional complaints in the hypothetical not supported by substantial evidence);

Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001). Where a hypothetical question precisely sets forth all of the claimant's physical and mental impairments, a vocational expert's testimony constitutes substantial evidence supporting the ALJ's decision. Robson v. Astrue, 526 F.3d 389, 392 (8th Cir. 2008) (holding that a vocational expert's testimony is substantial evidence when it is based on an accurately-phrased hypothetical capturing the concrete consequences of a claimant's limitations); Wingert v. Bowen, 894 F.2d 296, 298 (8th Cir. 1990).

When a hypothetical question is more restrictive than the residual functional capacity assigned to a claimant by an ALJ, the hypothetical is sufficient so long as it encompasses all of the restrictions in the residual functional capacity. Miller v. Astrue, 233 Fed. Appx. 590, 2007 WL 1452966, *2 (8th Cir., May 18, 2007) (hypothetical which is more restrictive than the residual functional capacity assessment sufficient so long as it includes all of the impairments that the ALJ found to be substantiated by the record); Fredrick v. Colvin, 2016 WL 755647, *6 (W.D. Mo., February 25, 2016) ("[I]f the vocational expert could offer jobs that exist in the national economy under a more restrictive hypothetical, those same jobs would necessarily still apply to Fredrick's less-restrictive RFC."); Graffis v. Colvin, 2015 WL 5098776, n.5 (E.D. Mo., August 11, 2015) (hypothetical that is more restrictive than the residual functional capacity the ALJ found constitutes sufficient evidence, and any discrepancy between the hypothetical and residual functional capacity is harmless error); Hanson v. Colvin, 2013 WL 4811067, *23 (D. Minn., September 9, 2013); McGowin v. Astrue, 2013 WL 655159, *10 (E.D.

39

Mo., February 22, 2013); <u>Vann v. Astrue</u>, 2012 WL 651412, n. 68 (W.D. Mo., February 28, 2012); <u>Robinson v. Astrue</u>, 2010 WL 481045, *17 (E.D. Mo., February 4, 2010).

Because the vocational expert in this case testified that a hypothetical claimant with a residual functional capacity more restrictive than that of plaintiff could perform the jobs of patcher, dowel inspector, and document preparer, the ALJ did not err in relying on her testimony to find that plaintiff could also perform those jobs.

Plaintiff also argues that the ALJ failed to comply with Social Security Ruling 00-4p by not asking the vocational expert if her testimony was consistent with the Dictionary of Occupational Titles. This argument is without merit. The ALJ specifically asked the vocational expert to identify any conflicts between her testimony and the Dictionary of Occupational Titles. The vocational expert testified that the limitation to sit and stand at will was not addressed by the Dictionary of Occupational Titles and that she based her testimony on her own review of the tasks associated with the identified jobs. In accordance with Social Security Ruling 004-p, in her opinion the ALJ mentioned the vocational expert's explanation of the conflict between the Dictionary of Occupational Titles and her testimony regarding the sit/stand option.

## VIII.   CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

Case 2:15-cv-04292-REL   Document 27   Filed 03/31/17   Page 40 of 41

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
March 31, 2017